BUTLER COUNTY MEMORIAL PARK, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Butler County Memorial Park, Inc. v. Commissioner
Docket No. 19572-80.
United States Tax Court
T.C. Memo 1982-678; 1982 Tax Ct. Memo LEXIS 64; 45 T.C.M. (CCH) 181; T.C.M. (RIA) 82678; November 23, 1982. Gregory R. Wilson, for the petitioner. Robert J. Kastl, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year Ended
Deficiency
May 31, 1975
$105,910.32
May 31, 1976
60,992.39
May 31, 1977
174,924,82
Due to concessions, the issues for decision are 1) whether petitioner lost its exemption from taxation under section *66 501(c)(13)[1] by virtue of an alleged inurement of its net earnings to the benefit of its sole shareholder in a transaction in early 1973; 2) whether, if petitioner is no longer tax exempt, respondent abused his discretion in 1980 by retroactively revoking petitioner's exemption from taxation effective the date of that transaction; and 3) whether, if petitioner was not exempt during the years in issue, it may now elect to report certain sales income under the installment method provided in section 453. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioner Butler County Memorial Park, Inc. is a corporation organized on June 2, 1964, under the laws of the State of Ohio. It maintained its principal office and place of business at Hamilton, Ohio, at the time the petition was filed. Petitioner was incorporated by Maurice A. Lambroff, Donald P. Oglesbee and Walter *67 R. Bender as "a profit Corporation under the General Corporation Act of Ohio, but Not for Profit of the Owners or Stockholders." Its articles of incorporation authorized it to engage in the ownership and operation of a cemetery for burial of the dead, a mausoleum and other related activities. The articles also state "that NO DIVIDENDS SHALL BE PAID TO ANY CLASS OR HOLDER OR STOCK, AND THAT UPON DISSOLUTION OF SAID CORPORATION, NO SHAREHOLDER * * * SHALL BE ENTITLED TO THE PAYMENT OF ANY MONEY IN EXCESS OF EACH AND ALL SHAREHOLDER'S ORIGINAL INVESTMENT IN SAID CORPORATION." Upon incorporation, Maurice A. Lambroff purchased all 50 authorized shares of petitioner for a total of $500. Shortly before petitioner's incorporation, Maurice Lambroff and Elizabeth Lambroff, husband and wife, purchased a 109.576 acre tract of land ("the Cavin tract") from Thomas and Lucy Cavin, husband and wife. On June 12, 1964, the Lambroffs sold a 36 acre portion of the Cavin tract to petitioner at a price of $411 per acre. This sale to petitioner was at fair market value. Petitioner was both formed and operated with the intent of complying with *68 Chapter 1721 of the Ohio Revised Code, which provides, among other things, an exemption to certain cemetery associations from all real and personal property taxes of the State of Ohio and its political subdivisions. All of the receipts and income of cemetery associations described in Chapter 1721 must be used exclusively for laying out, preserving, protecting and embellishing the cemetery and avenues within it or leading to it, for the erection of buildings necessary for cemetery purposes and for paying the necessary expenses of the association; but no debts may be incurred for any other purposes, nor may any funds of the corporation or proceeds of land sold by it be divided among its stockholders. Ohio Rev. Code Ann. sec. 1721.06 (Page 1978). From the date of its incorporation to the time of trial herein, petitioner has been exempted from all real and personal property taxes of the State of Ohio and its political subdivisions pursuant to Chapter 1721 of the Ohio Revised Code. Since its inception, petitioner has conducted approximately 1,200 burials on its lands and in its mausoleum. The burial grounds consist of 112 acres in central Butler County, Ohio, of which approximately *69 35 acres have been fully developed. The various gardens include the "Veterans Section" consisting of the Field of Honor and the Garden of Freedom. Each United States military service veteran is entitled to free space (except for a one time perpetual care charge) in this section which was dedicated by General William Westmoreland for this purpose in 1976. As of May 31, 1977, approximately 10,000 lots had been sold to individuals who have purchased the gravesites in anticipation of their eventual burial by petitioner. Petitioner's gravesites are attractively landscaped, including over 6,000 geraniums, and are carefully maintained with a view toward the dignity and beauty of the grounds. Substantially all of the gravesites which are sold are eventually used by the original purchasers. Over 5,500 gravesites were transferred in anticipation of burial without cost to veterans, stillborn children and to the poor. From the time of petitioner's incorporation to early 1973, petitioner's business was managed and operated by its sole shareholder, Maurice A. Lambroff. However, due to poor health and his responsibilities for the operation of the Miami Memorial Park, Maurice Lambroff was *70 unable to devote the necessary time and effort to the management and operation of petitioner's business and he commenced efforts to sell his shares of petitioner in the latter part of 1972. In early 1973, Robert and Phyllis Jordan, husband and wife, agreed to purchase all of petitioner's shares together with a 40.153 acre parcel of land and a 21.166 acre parcel of land (both from the Cavin tract) from Maurice and Elizabeth Lambroff. Lester W. Koehler, the attorney for the Jordans, then drafted an "Agreement for the Sale of Corporate Stock" between Maurice and Elizabeth Lambroff as sellers and Robert and Phyllis Jordan as buyers. The agreement stated, in pertinent part: WHEREAS, Sellers are the sole owners of all of the authorized, issued and outstanding shares of common stock in said Corporation [petitioner]; and WHEREAS, said Corporation is the owner of approximately 112.285 acres of land in Section 35, Town 3, Range 3, Wayne Township, Butler County, Ohio, of which a parcel of 40.153 acres and a parcel of 21.166 acres are presently in the name of Sellers as Trustees for the Corporation; and WHEREAS, Buyers wish to purchase and Sellers wish to sell all of the authorized, *71 issued and outstanding shares of common stock of said Corporation; NOW, THEREFORE, in consideration of the mutual promises hereinafter made, IT IS AGREED by and between the parties as follows: 1. That Sellers agree to sell and Buyers agree to buy all of the authorized, issued and outstanding shares of common stock in Butler County Memorial Park, Inc., for a total purchase price to be computed as follows: A corporate balance sheet shall be constructed by the parties, based upon figures supplied by Sellers, as of the date of the execution hereof, on which total assets and total liabilities shall each be the stated sum of $274,000.00. Such balance sheet shall list as assets accurate balances, as of such date, of all deposits in financial institutions to the credit of the Corporation, and shall list all other assets in gross for a total sum of $274,000.00. Such balance sheet shall list as liabilities all corporate trust fund obligations in the total sum of $65,402.00; an indebtedness to Maurice A. Lambroff in the sum of $33,373.15; an indebtedness to Miami Memorial Park of Piqua, Ohio, in the sum of $39,167.45; an indebtedness to Daugherty and Associates in the estimated sum of *72 $5,000.00, and accurate balances, as of such date, of all other corporate indebtedness. The total of all such liabilities shall be deducted from the sum of $274,000.00 to determine shareholders' equity (capital stock and surplus) in the Corporation, and such shareholders' equity shall be the purchase price of said shares of common stock. A balance sheet for petitioner, determined as set out in paragraph 1 of the agreement, was attached to the agreement and showed "Shareholders' Equity (Capital Stock and Surplus)" to be $113,378.17.
In providing the terms of payment of the purchase price, the agreement stated: 3. That said purchase price shall be paid as follows: (a) The sum of $9,500.00 upon the execution hereof, the receipt of which is hereby acknowledged. (b) The sum of $20,654.15 upon the consummation of the sale herein contemplated. (c) The balance of said purchase price in the sum of $83,224.02 shall be evidenced by a negotiable promissory note executed and delivered by Buyers to Sellers on the date of the consummation of the sale herein contemplated. Said note shall bear interest at the rate of four (4%) per cent per annum, and shall be payable in annual installments *73 of $8,000.00, plus interest, commencing on the 9th day of March, 1974. Said note shall be secured by a mortgage on the 40.153 acre tract of land to be conveyed by Sellers as Trustees to Buyers as Trustees. The agreement further provided: 4. That Sellers shall, immediately following the execution of this Agreement and prior to the consummation of the same, execute and deliver to the Buyers, as Trustees for the Corporation, a standard warranty deed for the abovementioned parcels of land held by them as Trustees for the Corporation, containing approximately 61.319 acres. That such conveyance shall be subject to any mortgage liens on said real estate. That upon consummation of the sale herein contemplated, Buyers shall execute and deliver to Sellers a mortgage upon the 40.153 acre tract included in said 61.319 acres in accordance with Paragraph 3, (c) hereof. That following consummation of the sale herein contemplated, Buyers shall execute and deliver to the Corporation a standard warranty deed for said 61.319 acres. That such conveyance shall be subject to any mortgage liens on said real estate, which liens, except the mortgage given by Buyers to Sellers, the Corporation, as *74 Grantee, shall assume and agree to pay. Finally, the agreement stated that upon consummation of the sale the Jordans would cause petitioner to issue a promissory note to Miami Memorial Park for a valid $39,167.45 debt owed by petitioner. This note was to be secured by a mortgage on the 21.166 acre parcel. This agreement was signed on February 21, 1973, by all parties except Phyllis Jordan, who signed at a later date. At the closing on March 9, 1973, the Lambroffs conveyed the 21.166 acre tract to petitioner. Also at the closing, the Lambroffs, as husband and wife, (i.e., indicating no trustee relationship on the deed), conveyed the 40.153 acre tract to "Robert Jordan, Trustee" and took back a mortgage on that tract from "Robert Jordan, Trustee" securing the $83,224.02 promissory note of the purchase agreement. Thereafter, "Robert Jordan, Trustee" conveyed the 40.153 acre tract to petitioner subject to the above-described mortgage. The deeds and mortgage were also drafted by Koehler. Despite the fact that the stock sale agreement described the Lambroffs as holders of title to the 40.153 acre parcel and 21.166 acre parcel as trustees for petitioner, no such trust arrangement *75 existed. The Lambroffs were both legal and equitable owners of these parcels prior to February 21, 1973. In addition, despite the fact that the stock sale agreement and the relevant deeds involved described Robert Jordan as recipient of the 40.153 acre tract as trustee for petitioner, no such trust arrangement existed. Robert Jordan received the 40.153 acre tract in an individual capacity on March 9, 1973. From March 10, 1973, to the date of trial, Robert Jordan owned 40 shares of petitioner and Phyllis Jordan owned the remaining 10 shares. After March 9, 1973, and before April 12, 1977, the Jordans attempted to sell their shares in petitioner on either of the following terms: 1) sellers to receive $1.2 million and sellers to pay all existing debts (net out approximately $600,000) or 2) sellers to receive $600,000 and purchasers to assume all existing debts. On November 17, 1977, the Lambroffs acknowledged the satisfaction of the mortgage on the 40.153 acre tract. Since its incorporation, petitioner has been engaged in the ownership and operation of a cemetery, mausoleum and burial ground for the dead including the sale of markers, nonuments and related burial items and *76 has engaged in no other business. Since its incorporation, petitioner has never authorized, declared or paid any cash dividend. Since January 1, 1973, petitioner has not transferred any of its property other than in the ordinary course of business, at arm's length and on reasonable commercial terms. On January 5, 1965, petitioner made application to the Commissioner of Internal Revenue on Form 1026 for recognition of its exempt status under section 501(c)(13). All of the facts and representations set forth in the application were accurate and complete as of the date when the application was made and, except for the transactions occurring in 1973 which give rise to the dispute in this case, there have been no material departures from those facts and representations in petitioner's operation since January 1, 1973. Petitioner maintains a May 31 fiscal year. For each fiscal year of its existence petitioner has filed an information return (Treasury Department Form 990) pursuant to and in full compliance with section 6033. On July 17, 1980, the District Director notified petitioner of a revocation of petitioner's exempt status under section 501(c)(13) effective for all taxable *77 years beginning after February 21, 1973. In his statutory notice of deficiency, respondent determined that petitioner was liable for income taxes in the fiscal years ending May 31, 1975, May 31, 1976 and May 31, 1977, on the amount of increase in net worth petitioner had reported on its Form 990 in each of those years. Since its inception, petitioner has regularly sold cemetery plots on the installment plan. With respect to the sale of markers, monuments and related burial items, petitioner since its inception has been a dealer in personal property. In maintaining its books and records, reporting income for financial purposes and preparing Form 990s, during and prior to the years in issue petitioner employed an accrual method of accounting for the sale of cemetery plots, markers, monuments and related burial items. OPINION This case involves the retroactive revocation of a cemetery corporation's tax exempt status. Section 501(c)(13) provides an exemption from income tax for * * * any corporation chartered solely for the purpose of the disposal of bodies by burial or cremation *78 which is not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual. In the instant case, respondent argues that petitioner lost its entitlement to tax exempt status due to impermissible inurement of its net earnings to its shareholders beginning on February 21, 1973. Respondent first asserts that on that date Maurice Lambroff sold his $500 nominal equity interest in petitioner to the Jordans for $113,378.17, Petitioner's then book value. The sale of petitioner's shares for an amount equal to the corporation's book value, respondent contends, constituted impermissible inurement of the corporation's net earnings within the meaning of section 501(c)(13). Respondent next argues that the Jordans have recently attempted to resell their shares in petitioner for roughly $600,000. This also constitutes prohibited inurement in respondent's eyes. Finally, respondent contends that the March 9, 1973, conveyance of the 40.153 acre parcel from the Lambroffs, purportedly as trustees for petitioner, to Robert Jordan, purportedly as trustee for petitioner, *79 and thereafter to petitioner in its own name, during which transactions the parcel was subjected to an $83,224.02 mortgage, constituted the use of petitioner's assets as a private source of credit for its stockholders. This too, he argues, violated the non-inurement language of section 501(c)(13). In many respects this is a factual case. Respondent's allegations derive primarily from a reading of the stock sale agreement and land deeds drawn up in early 1973. Where respondent sees inurement, however, we mainly see bad drafting. Since much of respondent's case hinges on this crucial distinction, we turn first to respondent's assertion that the Lambroffs held the 40.153 acre parcel and the 21.166 acre parcel as trustees for petitioner prior to February 21, 1973. Respondent's sole support for this proposition is the words of the stock sale agreement, which rather clearly state that the two parcels are held by the Lambroffs as trustees for petitioner. At the trial of this case Koehler, who drafted the stock sale agreement, testified that his description of the Lambroffs as trustees in that document was erroneous. We believed Koehler. While respondent's theory of the true *80 nature of the transaction is consistent with the conveyance of the 61.319 acre tract to Jordan as trustee, we think this theory overlooks the crucial fact that the land was actually conveyed by the Lambroffs as husband and wife, and not by them as trustees. A reasonable inference to be drawn from this fact is that the 61.319 acres belonged to the Lambroffs and not petitioner. Had the Lambroffs in fact held title as trustees, the form of conveyance as a matter of fact utilized would have created a cloud on the title of the tract, thereby rendering it unmarketable and unavailable for financing security purposes. In weighting this significant piece of evidence together with Koehler's testimony against the designation of the Lambroffs as trustees in the agreement, we think the evidence of record is sufficiently in favor of the petitioner to make a prima facie case and of going forward on this point to the respondent. He had the burden of backing up his theory with further proof of the true nature of the transaction. This he has not done, but might easily have done by calling Robert Jordan to testify as to his version of the transaction, [2] and by furnishing the Court with the chain *81 of title of the Cavin tract from the time the Lambroffs acquired it in 1964 to February 21, 1973, the date of the questioned transaction. In this connection Koehler testified to his impression that there were some earlier dealings in land between the Lambroffs and petitioner, but that he could not recall or was unfamiliar with the details. Respondent was well aware of the crucial disparity between the Lambroff's deed and the agreement, since both documents were stipulated. Nevertheless, he made no attempt, by evidence of his own, to resolve the discrepancy. While it seems highly likely that the Lambroffs may at some time have contemplated conveying the land to petitioner, that possibility, in and of itself, falls far short of creating a trusteeship. If anything was revealed by the testimony in this case it was that Koehler inadvisably attempted shortcuts where legal and factual accuracy were required. Koehler described the overall deal between the Lambroffs and the Jordans as follows: Maurice Lambroff sought to sell out his 100 percent stock *82 interest in petitioner to Robert and Phyllis Jordan. At the same time Maurice and Elizabeth Lambroff intended to sell to the Jordans two parcels from the Cavin tract which abutted petitioner's cemetery, but which the Lambroffs had never sold or contributed to petitioner. The Jordans later intended to donate these two parcels (one subject to Jordan's mortgage) to petitioner. To accomplish both of these sales, Koehler drafted one document entitled "Agreement for the Sale of Corporate Stock," naming Maurice and Elizabeth Lambroff as the sellers (although Elizabeth Lambroff did not own any of petitioner's stock) and Robert and Phyllis Jordan as buyers. The document did not indicate the fact that Phyllis Jordan was to only purchase 10 shares of petitioner, while her husband was to purchase 40. In addition, rather than setting out separate purchase prices for the land and the stock, one aggregate purchase price was established for both. Another mistake of the agreement was the aforementioned naming of the Lambroffs as holders of the two disputed parcels as trustees and the Jordans as recipients of the 40.153 acre parcel as trustees. Somewhere Koehler got the idea that calling everyone *83 a trustee with respect to this land would simplify matters in the conveyance of marketable title to petitioner (the intended ultimate recipient of both parcels). In particular, Koehler was concerned that Phyllis Jordan would not be at the signing of the stock sale agreement or at the closing. In order for the Jordans to convey marketable title to the 40.153 acre parcel to petitioner's Phyllis Jordan would have to join in the conveyance to cut off her dower interest. Koehler interpreted Ohio Rev. Code Ann. sec. 2103.021 (Page 1976) to allow the passage of marketable title to petitioner without Phyllis Jordan's signature if the 40.153 acre tract was deeded first to Robert Jordan as trustee for petitioner (although there was no trustee arrangement) and then from Robert Jordan, trustee, to petitioner. The chain of title at least would look proper. After all the various conveyances, petitioner would be the recipient of an additional 61.319 acres, it would hold 40.153 of its new acres subject to a mortgage of $83,224.02 in favor of the Lambroffs and it's stock would be owned by the Jordans. The purchase price for the land and stock would be $113,378.17. We believe this was the *84 actuality of the transaction. Respondent argues that the stock sale agreement was only a stock sale agreement and that the complicated conveyances of land described in the agreement constituted merely the circular conveyance of petitioner's land to Robert Jordan as trustee for petitioner and then back to petitioner. Respondent contends the land conveyances were so structured to compel petitioner to secure $83,224.02 of the purchase price the Jordans were paying Maurice Lambroff for petitioner's stock. In addition, respondent argues that the $113,378.17 purchase price of the agreement was petitioner's book value. First, we wonder why, if the stock sale agreement was merely a sale of stock (all owned by Maurice Lambroff), Elizabeth Lambroff was also named as a seller in the agreement. Respondent's theory cannot explain this drafting oddity, while petitioner's theory that the document was a stock sale and land sale agreement does, at least, suggest an explanation. Second, there is a rather striking correlation between what we believe is the value of the land transferred and the $113,378.17 "stock" purchase price. Respondent contends the $113,378.17 constituted petitioner's book *85 value. The only evidence to support that assertion is the balance sheet for petitioner attached to the stock sale agreement. Upon examination, however, we conclude that the balance sheet includes in petitioner's assets the value of the 61.319 acres of land transferred to petitioner in the course of the stock sale. The disparity between the $500 original owner's equity and the $113,378.17 owner's equity represents the value of the land purchased by the Jordans in the transactions and then donated as a capital contribution to petitioner. (The $83,224.02 note is not reflected as a corporate liability because the corporation never assumed the note which the Jordans intended to pay off out of their own funds.) The $113,378.17 does not reflect the corporation's retained earnings, but rather the Jordan's impending contribution to its capital. Our conclusion that the 61.319 acres of land was worth at least $113,378.17 comes from the fact that the 40.153 acre tract was used by petitioner to secure an $83,224.02 note and the 21.166 acre tract was used to secure a $39,167.45 note. If we assume that the mortgages given approximated the fair market values of the Lambroffs' equity in these *86 parcels on March 9, 1973, the Jordans actually purchased this land at a slight bargain. In summary, we find that in substance what happened on February 21, 1973, and March 9, 1973, was the sale of 61.319 acres of land by the Lambroffs to the Jordans for approximately $113,378.17, the contribution of such land to petitioner (with one parcel subject to a mortgage which did not exceed the parcel's fair market value) and the transfer of petitioner's shares from Maurice Lambroff to the Jordans at a nominal value. Section 501(c)(13) is not unique in conditioning an organization's exempt status in part on the absence of inurement of the organization's net earnings to the benefit of any private shareholder or individual. Such non-inurement language may also be found at sections 501(c)(3), (6), (7), (9), (11) and (19). [3] In fact, the legislative history of section 501(c)(13) indicates that its non-inurement language was derived verbatim from the predecessor of section 501(c)(3), [4] and at least in this respect those subsections should be read in pari materia. *87 Under section 501(c)(3), an organization's incurring a debt to purchase an asset at fair market value does not constitute private inurement of the organization's net earnings. See Hancock Academy of Savannah, Inc. v. Commissioner,69 T.C. 488, 492 (1977) and cases cited therein. As we view the evidence herein, nothing more happened on March 9, 1973, with respect to the 40.153 acre parcel than its contribution by the Jordans to petitioner subject to a mortgage not exceeding the land's fair market value. Petitioner did not assume the mortgage, nor is there any evidence it paid off the mortgage out of its own funds. In any event, even assuming that petitioner did pay off the mortgage, the most we could conclude is that petitioner in effect purchased the land from the Jordans at fair market value. In either case, the law is clear that no impermissible inurement of petitioner's net earnings occurred. Respondent's argument that the Lambroffs sold their stock in petitioner at a price equal to petitioner's book value on February 21, 1973, is similarly unavailing. We have found *88 that the purchase price paid by the Jordans did not reflect petitioner's retained earnings, but rather reflected the value of the 61.319 acres simultaneously purchased that day. The shares themselves were only sold by Maurice Lambroff for a nominal value. Since the factual underpinnings of respondent's argument falls, we need not discuss its legal implications further. The only other suggested incident of inurement of petitioner's net earnings to its shareholders is the attempt by the Jordans during the years in issue to sell their shares in petitioner for $600,000. Insofar as the record indicates, such an attempt has as yet been unsuccessful. Even assuming without deciding that such a sale would constitute impermissible inurement of petitioner's net earnings within the meaning of section 501(c)(13), we do not think that the mere attempt to make such a sale constitutes grounds for revoking an organization's tax exemption. We believe respondent must, at the very least, await such a sale before he may attempt to revoke a cemetery corporation's tax exempt status. Respondent has cited no other instances of inurement warranting the retroactive revocation of petitioners exemption. *89 Accordingly, we hold that petitioner was exempt and not liable for income taxes during the years in issue. Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. No explanation was proffered by either party as to why Jordan, seemingly an important witness, did not testify in this case.↩
3. See also sections 170(c)(2), (3) and (5). ↩
4. See 61 Cong. Rec. 7489-7490 (1921).↩